# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## CENTRAL DIVISION
## AT LEXINGTON

| | |
|---|---|
| **KELLY WATKINS, JR., et al.,** | **CIVIL ACTION NO. 5:14-337-KKC** |
| **Plaintiffs,** | |
| **V.** | |
| **WELLS FARGO ADVISORS, LLC,** | |
| **Defendant.** | |

*(Consolidated with)*

| | |
|---|---|
| **WELLS FARGO ADVISORS, LLC,** | **CIVIL ACTION NO. 5:14-348-KKC** |
| **Plaintiff,** | |
| **V.** | **<u>MEMORANDUM<br>OPINION AND ORDER</u>** |
| **KELLY WATKINS, SR., et al.,** | |
| **Defendants.** | |

\*\*\* \*\*\* \*\*\*

This matter is an inter-generational, intra-family dispute over money. Kelly Watkins, Sr. ("Kelly, Sr.") asserts that the transfer of assets on December 29, 2013 to his sons, Kelly Watkins, Jr. ("Kelly, Jr.") and James Watkins, was a gift *causa mortis*. (DE 38 Sr.'s Mem. in Supp. at 5.) Kelly, Jr., James, and Lisa Watkins Spicer[1] ("The Progeny") contend that Kelly, Sr.'s transfer was an irrevocable gift *inter vivos*. (DE 47-2 The Progeny's Mem. at 3.) Both sides of the family moved for summary judgment on their respective theories. (DE 38; DE 47). For the following reasons, the Court will deny both motions.

---

[1] Lisa Watkins Spicer is James's daughter. James transferred his share of the December 29 assets to Lisa on January 10, 2014. (*See* DE 38-11 Interrog. at 28–34, 48–59.)

## I. BACKGROUND

Kelly, Sr. is a ninety-three-year-old man from Jackson, Kentucky. He has two sons, Kelly, Jr. and James, and an adopted daughter, Kelly Margaret; Lisa is Kelly, Sr.'s granddaughter. Kelly, Sr. is a veteran of foreign wars, has "worked hard all [his] life," doesn't smoke, doesn't drink, and routinely saved approximately half of his income. (DE 39-1 Dep. of Kelly Watkins, Sr., hereinafter "Sr. Dep.," at 21, 59.) Leading such a judicious life, Kelly, Sr. built a significant nest egg. He held accounts at First National Bank, Citizens Bank, and Wells Fargo totaling approximately $500,000; he owned his home in Jackson, Kentucky; and he owned additional property, including mineral rights to the land, in Breathitt County, Kentucky. (DE 38-11 Interrog. at 15, 28, 38.) Kelly, Sr. previously intended to devise his nest egg to "his boys." (DE 38-11 Interrog. at 5; DE 39-4 Dep. of Lisa Watkins Spicer, hereinafter "Spicer Dep.," at 14, 50.)

Unfortunately, in November 2013 Kelly, Sr. fell and broke his hip. (Sr. Dep. at 26.) He underwent hip replacement surgery and then commenced rehabilitation. (DE 38-11 Interrog. at 13–14.) In December 2013, Kelly, Sr. moved to Nim Henson Geriatric Center. (DE 38-11 Interrog. at 14.) Kelly, Sr. thought he was going to die. (DE 39-2 Dep. of Kelly Watkins, Jr., hereinafter "Jr. Dep.," at 31–32; DE 39-3 Dep. of James Watkins, hereinafter "James Dep.," at 32–33; Spicer Dep. at 84–85; DE 50-1 Aff. of Kelly Watkins, Sr., hereinafter "Sr. Aff.," at 2.)

Kelly, Jr. claims that—while in Nim Henson—Kelly, Sr. expressed the desire to distribute his assets evenly between Kelly, Jr. and James. (Jr. Dep. at 32, 79–80.) The Progeny thought that Kelly, Sr. wanted to distribute the money in his various accounts because "Kelly, Sr. was hoping to go to the V.A. Nursing Home in Hazard, Kentucky[, but h]e thought that he had too much money deposited in his accounts and that would prevent

him from being able to get into the V.A. home." (DE 38-11 Interrog. at 15.) Kelly, Sr. contests this claim and states that he would have never given away his assets before his death. (Sr. Aff. at 2.)

In mid-December 2013, Kelly, Jr. endorsed a check to receive approximately $20,000 from Kelly, Sr.'s First National Bank account. (Jr. Dep. at 140–41.) Kelly, Jr. evenly divided the proceeds with James. (Jr. Dep. at 141.) Additionally, Kelly, Jr. and James each received approximately $80,000 from Kelly, Sr.'s Citizens Bank account. (Jr. Dep. at 156–59, 162; James Dep. at 39–41.) And on December 29, 2013, Kelly, Sr. signed a transfer document ceding his Wells Fargo assets to Kelly, Jr. and James. (DE 38-8 Transfer Doc.) Kelly, Sr. does not remember these transactions. (Sr. Dep. at 15–17, 22, 54.)

Kelly, Sr.'s condition improved, and he was discharged from Nim Henson in April 2014. (DE 38-11 Interrog. at 10.) After his discharge, he moved in with his adopted daughter, Kelly Margaret, and her husband, Chris. (Sr. Dep. at 25.) Kelly Margaret and Chris modified their home to meet Kelly, Sr.'s needs and are providing exceptional care. (Jr. Dep. at 39–41, 65–66, 134–38.) Kelly Margaret and Chris also facilitated visits between Kelly, Sr. and other family members. (DE 38-11 Interrog. at 10; Jr. Dep. at 165–66.)

Kelly, Jr. visited his father shortly after he moved in with Kelly Margaret and Chris. During this visit, Kelly, Jr. declared that he hoped that his father would "hurry up and die." (DE 38-11 Interrog. at 23; Sr. Dep. at 41–42; Jr. Dep. at 195–97.) Understandably, Kelly, Sr. was extremely hurt. He then received bank statements for the first time after his discharge from Nim Henson and discovered that Kelly, Jr. and James "just about cleaned [him] out." (Sr. Dep. at 41.) Kelly, Sr. does not remember writing any checks payable to Kelly, Jr.; ordering Citizens Bank to divide his account between Kelly, Jr. and James; or signing the December 29 Transfer Document. (Sr. Dep. at 15–17, 22, 54.) Kelly, Sr.

3

presumes that James's wife orchestrated these transfers, but no deposed witness could confirm or discredit these allegations and the parties have not deposed James's wife. (*See* Spicer Dep. at 35–39.)

Kelly, Sr. contacted counsel to help him recover his assets because he claims that he did not intend to transfer these assets *before* his death. (Sr. Dep. at 54.) Kelly, Sr.'s counsel informed Wells Fargo that the December 29 Transfer Document was not valid. (*See* DE 38-11 Interrog. at 60.) Wells Fargo then contacted the Progeny and stated that "Wells Fargo Advisors has learned that there may be conflicting claims regarding ownership and/or control of the account . . . [and d]ue to these conflicting claims, Wells Fargo Advisors has restricted the Account from any trading, transfers out, withdrawals, checking, debit cards, etc." (DE 38-11 Interrog. at 60.)

The Progeny initiated a state court action in Breathitt County to release Wells Fargo's restriction on their accounts. (DE 1-1 Compl. at 2–4.) Wells Fargo removed the state court action to this Court on the basis of diversity jurisdiction (DE 1) and filed an interpleader complaint with this Court (No. 5:14-cv-00348-KKC DE 1). This Court consolidated the removal action and the interpleader complaint (DE 7) and the parties commenced discovery. After receiving answers to interrogatories and taking the depositions of Kelly, Sr., Kelly, Jr., James, and Lisa, both parties moved for summary judgment. (DE 38; DE 47).

## II. ANALYSIS

Summary judgment is appropriate only if the pleadings, depositions, affidavits, stipulations, admissions, and interrogatory answers demonstrate that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) & (c). In reviewing a motion for summary judgment, a court must

4

consider the evidence—and draw all justifiable inferences—in the light most favorable to the non-moving party. *Payne v. Novartis Pharms. Corp.*, 767 F.3d 526, 530 (6th Cir. 2014). "The burden to show that there are no genuine issues of material fact falls on the parties seeking summary judgment." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "The ultimate question is whether the evidence presents a sufficient factual disagreement to require submission of the case to the jury, or whether the evidence is so one-sided that the moving parties should prevail as a matter of law." *Payne*, 767 F.3d at 530.

When sitting in diversity, this Court must apply Kentucky substantive law. *Id.* In resolving issues of Kentucky law, "we look to the final decisions of that state's highest court, and if there is no decision directly on point, then we must make an *Erie* guess to determine how that court, if presented with the issue, would resolve it." *Conlin v. Mortg. Elec. Registration Sys., Inc.*, 714 F.3d 355, 358–59 (6th Cir. 2013). "[I]ntermediate state appellate courts' decisions are also viewed as persuasive unless it is shown that the state's highest court would decide the issue differently." *Id.* (internal quotations omitted).

A "gift" is a voluntary transfer of property to another without compensation. Black's Law Dictionary (10th ed. 2014). Kentucky recognizes two categories of gifts: gifts *inter vivos*, gifts between the living, and gifts *causa mortis*, gifts made in contemplation of the donor's imminent death. *Dickerson v. Snyder*, 272 S.W. 384, 385 (Ky. 1925).

Gifts *causa mortis* are, in fact, a specialized variation of gifts *inter vivos* with additional elements to protect against fraud. *See Howell v. Herald*, 197 S.W.3d 505, 507–08 (Ky. 2006). A death-bed donor cannot later verify intent to make a gift to a donee; therefore,

5

the law requires a more exacting analysis of the donor's state of mind at the time the donor gives the gift. *See id.* Additionally, the specialized elements necessary for gifts *causa mortis* prevent circumvention of testamentary requirements. *See id.*

Both gifts *inter vivos* and gifts *causa mortis* require donative intent to make a gift, delivery to the donee, and competence at the time of giving and receiving the gift. *Id.* at 507; *Wells v. Salyers*, No. 2005-CA-002049-MR, 2007 WL 625110, at *5 (Ky. Ct. App. Mar. 2, 2007). In addition, gifts *inter vivos* must be irrevocable. *Howell*, 197 S.W.3d at 507.

Gifts *causa mortis*, however, include the following additional elements: the donor must subjectively expect imminent death and the gift must be revocable any time before the donor's death. *Dickerson*, 272 S.W. at 385. A gift *causa mortis* is not a final, irrevocable gift to the donee until the donor's death. *Wells*, 2007 WL 625110, at *5.

Here, the parties agree that the common elements of delivery and competence are not contested. (DE 47-2 The Progeny's Mem. at 2–3; DE 50 Sr.'s Reply at 1–3.) The parties also agree that Kelly, Sr. expected his imminent death at the time he signed the December 29 Transfer Document. (DE 47-2 The Progeny's Mem. at 2–3; DE 50 Sr.'s Reply at 1–3.) The parties contest the other elements necessary to establish a gift *causa mortis* or a gift *inter vivos*.

Kelly, Sr. asserts that he lacked donative intent to make a gift or, alternatively, that the gift was revocable. (DE 50 Sr.'s Reply at 3.) He repeatedly states that he does not remember signing the December 29 Transfer Document and, therefore, contends that he could not have had the requisite donative intent to gift the Wells Fargo assets. (Sr. Dep. at 15–17, 54; Sr. Aff. at 2; DE 50 Sr.'s Reply at 3.) Further, Kelly, Sr. claims that any gift would have been revocable because he "would never have given [his] boys [his] money to

have for their own while [he] was alive if [he] believe [he] would ever have needed the money to live on . . . ." (Sr. Aff. at 2.)

The Progeny contend that Kelly, Sr. possessed the necessary donative intent and that he intended for his gift to be irrevocable. (DE 47-2 The Progeny's Mem. at 3, 5–6.) Specifically, they claim that Kelly, Sr. told them that he had too much money to gain admission to the V.A. Nursing Home and that gifting his assets could help him fall within the V.A.'s wealth requirement. (DE 38-11 Interrog. at 15.) The Progeny assert that this demonstrated both donative intent and an intent to irrevocably transfer assets. (DE 47-2 The Progeny's Mem. at 3, 5–6.)

Overall, the record contains evidence that could support a number of inferences. First, Kelly, Sr. may not have intended to make a gift; therefore, he would not have made a valid gift *inter vivos* or gift *causa mortis*. *See Howell*, 197 S.W.3d at 507. Second, Kelly, Sr. may have intended to make a gift but intended the gift to be revocable—a valid gift *causa mortis*. *See Dickerson*, 272 S.W. at 385. Or third, Kelly, Sr. may have intended to make an irrevocable gift—a valid gift *inter vivos*. *See Howell*, 197 S.W.3d at 507. The record evidence establishes genuine questions of material fact concerning Kelly, Sr.'s donative intent and whether he intended the transfers from his accounts to be revocable or irrevocable. The evidence is not "so one-sided" that only one inference is permissible, and the Court may not resolve this factual disagreement. *Payne*, 767 F.3d at 530. It is the jury's function to weigh the evidence and determine which inference is correct; therefore, summary judgment is inappropriate. *Anderson*, 477 U.S. at 255.

### III. CONCLUSION

Accordingly, for the reasons stated above, the Court **ORDERS** the following:

1. Kelly Watkins, Sr.'s motion for summary judgment (DE 38) is **DENIED**;

2. Lisa Watkins Spicer, James Watkins, and Kelly Watkins, Jr.'s counter motion for summary judgment (DE 47) is **DENIED**;

3. This matter is **RESTORED** to the Court's **ACTIVE DOCKET**; and

4. This matter is scheduled for a telephone conference on **July 9, 2015 at 3:00 p.m.** to discuss an expedited schedule for prompt and efficient resolution of this matter. The parties are to call 888-684-8852, using access code 6823688. Please dial in a few minutes before the conference begins.

Dated June 12, 2015.

KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY